UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GEORGE RUSSELL, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 4:10-CV-3057 |
| | § | |
| SCOTTSDALE INSURANCE COMPANY, | § | |
| | § | |
| Defendant. | § | |

## OPINION AND ORDER

Pending before the Court is Defendant Scottsdale Insurance Company ("Scottsdale") Motion for Summary Judgment (Doc. 51), Plaintiffs' ("Russell") Response (Doc. 56), and Defendant's Reply. Having considered the motion, the response, the reply, the facts in the record, and the applicable law, the Court concludes that the motion should be granted.

## I.    Background

This is a Hurricane Ike insurance case. Russell owns a warehouse in Huntsville, Texas that was insured by Scottsdale under a policy effective from September 1, 2008 to September 1, 2009. ("Policy"). Doc. C-1. On September 13, 2008, Hurricane Ike struck Huntsville, displacing metal roof coverings on the warehouse and causing interior water damage to several rooms. Doc. 1-2 at 2, Doc. 52-3 at 11.  On December 22, 2008, Scottsdale sent an advance payment to Russell of $45,000, based on an invoice for temporary repairs in the amount of $43,732.50. Doc. 52-3 at 8. On February 6, 2009, Scottsdale tendered payment for $14,820.36, based on total repairs of $84,820.36, less the advance payment and $25,000 deductible. *Id.* Russell disputed the amount and filed suit. Doc. 52-3 at 8; Doc. 52-3 at 47; Doc. 52-4 at 44.[1]

---

[1] Notations on the check indicate one check was sent February 6, 2009 and another September 4, 2012, for the same amount, both of which were apparently rejected.

The main disagreement between the parties involves the north wall of the warehouse. Scottsdale's claims adjuster reported there was a horizontal bulge or "deflection" halfway up the wall. Doc. 52-3 at 11. Russell claimed the bulge was caused by the hurricane. In response, the adjuster requested an engineer's report by U.S. Forensic, LLC. The engineer made a rough visual estimate of the bulge. Doc. 52-3 at 38 ("The wall was noted to be outwardly deflected approximately 4 inches."); *Id.* at 40 ("The north wall of the building was observed to be outwardly deflected up to approximately 3.5 inches."). The engineer attributed the bulge to "long-term differential movement of the building and foundation," noting the wall had no "expansion or control joints" to prevent such movement. 52-3 at 36*,* 38. The engineer observed cracks in the wall, which he concluded were also not a result of the hurricane but gradual deterioration of the wall. The bulging portion itself was not cracked, but cracks were seen around the corners and windows. The cracks were "weathered, filled with debris, and in many locations, . . . sealant materials of various consistencies within the separations indicating the separations had been previously repaired and were not of recent origin." *Id.* The engineer observed similar weathered, debris-filled cracks in interior walls and trim. The engineer interviewed Russell and reported he admitted "cracks in the exterior walls had been filled with caulking materials on several occasions prior to the passage of Hurricane Ike." *Id.* at 37. Finally, the engineer observed that "building signage, overhangs, and window awnings were not damaged or displaced and appeared to have been unaffected by the reported high wind pressures." *Id.* at 38.

Based on the UBS report, Scottsdale denied coverage for the damage to the north wall under the Policy's exclusions for damage caused directly or indirectly by soil sinking, rising, or shifting; for damage from weather conditions that "contribute in any way" with soil movement; and for damage from faulty, inadequate, or defective design, construction, and repair. Doc. 52-3

at 44.  Russell objected to the report, claiming a report by Rimkus Consulting Group, who had inspected the wall after Hurricane Rita, stated the walls were "plumb" three years before Hurricane Ike. Doc. 52-3 at 7. After receiving final payment from Scottsdale, Russell called the adjuster and his insurance agent to complain. *Id.* at 8. Scottsdale responded with a "partial denial letter," enclosing the U.S. Forensic report and requesting that Russell provide within 30 days "additional information that should be considered or some other reason your policy should provide coverage." *Id.* at 45. Russell did not reply for seven months or invoke the appraisal process set forth in the policy. Doc. 58 at 6–7. On October 16, 2009, Russell sent a demand letter seeking the maximum coverage of $800,000. *Id.* at 8, 47. Scottsdale again requested additional information, and Russell did not reply for an additional nine months. *Id.* at 51.

On August 4, 2010, Russell filed suit in the 278th Judicial District Court of Walker County, Texas, seeking a declaratory judgment that the Policy covered the claim and monetary damages for (1) breach of the Policy; (2) bad faith; (3) violations of Texas Insurance Code §§ 541.060, 542.003, 542.058; (4) negligence and negligent misrepresentation; and (5) breach of the duty of good faith and fair dealing. Doc. 1-2. On August 25, 2010, Scottsdale removed to this Court. Russell subsequently filed an unopposed Motion to Abate to Enforce Appraisal Provision, granted by Judge Stacy on May 16, 2011.  Doc. 19. Scottsdale had agreed in a signed letter agreement not to oppose the Motion on condition that Russell give a deposition and authorize the Rimkus engineer to submit to deposition and to provide an engineer's report prepared for a previous suit arising from Hurricane Rita. Doc. 18-1. Judge Stacy's Order gave the parties 120 days to carry out the joint appraisal process provided for in the Policy. Doc. 19. The abatement was extended four times. Docs. 22, 26, 29, 45. In compliance with the appraisal process, the parties selected appraisers who selected an umpire. The two appraisers agreed on an initial

appraisal award of $112,004.99 ("Non-Wall Award"), exceeding Scottsdale's adjuster's value of $84,820.36. Doc. 52-4 at 5. Scottsdale tendered payment of $112,737.49, less the deductible and the excess amount paid over the cost of the temporary roof. Doc. 52-4 at 17–18, 34. Russell executed a settlement agreement, releasing Scottsdale from all claims relating to hurricane Ike damages, including any causes of action that could be alleged in the instant suit ("Civil Action No. 4:10-cv-03057"), not including claims arising from loss to the north wall. Doc 52-4 at 18.

Scottsdale and Russell's appraisers could not agree on an Appraisal Award for the north wall. Scottsdale's appraiser and the umpire, however, agreed to an amount of $204,377.51 (Replacement Cost Value) ("North Wall Award"). Doc. 52-4 at 8. According to the appraisal process in the Policy, an agreement of any two out of the three (i.e. one appraiser and the umpire) was binding. Doc. 52-2 at 32. The Appraisal Award agreement does not explain how the amount of $204,377.51 was determined. According to the filed Joint Status Reports, in preparation for the appraisal, Russell submitted an estimate to Scottsdale, along with Russell's forensic report from Clark Engineers,[2] which concludes: "From this data and observations [in the Rimkus report], it is apparent that there was not any significant distortion of the north wall prior to Hurricane Ike." Docs. 20, 31-2 at 27. Russell's appraiser testified she estimated the "cost of replacement" of the north wall at $1,280,000. Doc. 33-1 at 2. The record does not include a statement from Russell's appraiser in regard to whether the deflection in the north wall was *caused* by Hurricane Ike. Scottsdale's appraiser meanwhile contracted with Unified Building Sciences & Engineering ("UBS") to prepare another forensic report. Doc. 31-2 at 19. The UBS report concurred with the U.S. Forensic report, concluding: "Damage to the wall associated with Hurricane Ike would have been limited to isolated broken pieces of masonry at the roof level, which have been repaired." Doc. 31-2 at 30.

---

[2] The Clark report is not entered in the record but quotations appear in the UBS report. Doc. 31-2 at 27.

The UBS report disagreed with U.S. Forensic's measurement of the bulge ("approximately 4 inches"; "up to approximately 3.5 inches"), noting that U.S. Forensic did not indicate the "methodology or equipment utilized." Doc. 31-2 at 27. Based on a photograph in its report, U.S. Forensic appeared to have made a visual estimate after pressing a 2x4 piece of wood against the wall, which UBS stated was "not rational" or accepted practice for measuring the profile of a wall. *Id.* Using a laser, UBS performed a topographic survey and found a horizontal bulge in between the first and second floors varying from 0.7 to 1.3 inches. *Id.* at 26. UBS discovered the degree of bulge correlated with the degree of corrosion-related cracks around the steel lintels supporting the window openings. *Id.* Concurring with the U.S. Forensic and Rimkus reports, UBS found the cracks had been patched multiple times in the past. *Id.* at 23. UBS interviewed prior owner before Russell, who stated installed metal roofing due to leaks, but water had leaked through the north wall at the steel lintels, which had corroded. *Id.* at 22. Russell did not install a gutter system until after Hurricane Rita. *Id.* at 25. Most damning for Russell, photos from the Rimkus report placed side-by-side with current photos in the UBS report clearly show a bulge existed prior to Hurricane Ike. *Id.* at 25. Photos in the report also clearly show interior walls and shelving had been constructed to conform to the existing bulge. *Id.* at 28. In addition to the bulge, UBS's laser survey revealed that the north wall leaned 0.8 to 1.9 inches to the north. *Id.* at 26. UBS found the building had been constructed with the lean based on the condition of adjoining walls. *Id.* at 30.

Contrary to the engineer's reports, Russell testified the north wall was not damaged before Hurricane Ike. Doc. 31-1 at 77 ("Q. [B]efore Ike, did you do any masonry to [the north wall]? A. No, sir. . . . They were in good condition before Ike. "). Russell's sole evidence that the damage did not predate Ike, apart from his own testimony, is a statement in the Rimkus report,

made three years prior, that the north wall was "plumb and not misaligned." Doc. 31-1 at 26.

This statement has been the subject of ongoing controversy. It should be noted the statement was

made in the context of describing long-term deterioration of the wall (which dated back to the

1940s) and refuting the possible role of wind damage from Hurricane Rita:

> [C]racks were visible in the masonry walls near the corners of the structure. Also, minor cracks were visible in the masonry walls above and below windows. [R]epairs were evident in the masonry walls. We observed no cracks in the perimeter foundation beams. The west, south, east and north masonry walls were *plumb and not misaligned.*
> …………
>      Also, it should be noted during our inspection of the exterior of the building we observed no expansion joints or control joints in the masonry construction, which can contribute to cracking. No cracks were visible in the perimeter concrete beam or tie beam between concrete piers to suggest that movements in the foundation caused the masonry to crack. Also, the perimeter masonry walls were *reasonably plumb.* The above conditions and observations support the conclusions that lateral loads due to high winds have not caused the cracks in the masonry at the corners of the building.
>      During our inspection we observed random cracks above wall openings at the original structure and above wall openings at the addition. These types of random cracks are typical of a problem with the lentils above the wall openings. These types of cracks are not indicative of thermal movements or lateral loads due to high winds.

Doc. 31-1 at 26, 28 (emphasis added).  UBS discounted Rimkus's observation that the walls

were plumb, because "what Rimkus specifically implies by the word 'plumb' is not clearly

defined in their report, and to where on the building such a statement is applicable was not

reported.'" Doc. 31-2 at 27. Scottsdale's appraiser called the Rimkus engineer to clarify that

matter, and the engineer allegedly told the appraiser he "paid little attention to the other walls."[3]

---

[3] Scottsdale's appraiser related this phone conversation to Russell's appraiser, who testified she was told the Rimkus engineer "would not stand behind those statements to mean that the north wall in question was 'plumb and not misaligned.'" Doc. 33-1. Scottsdale's appraiser also emailed Russell's appraiser:

> I suggest that you contact the Rimkus engineer to discuss with him his evaluation of that building. I am sure you will find that conversation interesting. I would not anticipate you finding out any information different than what has already been relayed within the engineering report from UBS. Nevertheless, I would recommend that you complete your own investigation of the facts by talking with him. (by the way, as the appraiser, you have every right to complete the investigation you deem as necessary).

Doc. 30 at 7. Russell argues the phone call was improper because "[n]o ex parte contact was authorized" between the appraisers and the Rimkus engineer under the parties' letter agreement regarding the Motion to Abate. Doc. 33 at 2 n. 1. Russell further claims the appraiser's account of the phone call was a misrepresentation made in bad faith "to subvert the appraisal process." Doc. 48-1 at 25. On the contrary, the letter agreement only stated Scottsdale would not oppose the Motion to Abate on condition that "the Russells authorize the Rimkus engineer who made the inspection to give a sworn exam or deposition." Doc. 18-1 at 3. Russell's "authorization" was neither necessary nor sufficient for Scottsdale to obtain a deposition from the Rimkus engineer, whose report was purchased by Penn-America Insurance Company for its exclusive use. Doc. 31-1 at 10. The letter agreement did not address whether Scottsdale's deposition would occur during or after the appraisal process, nor whether the appraiser could separately interview the Rimkus engineer. In fact, Russell obtained a pre-suit deposition order from the 278th Judicial District Court of Texas, so that he could depose the Rimkus engineer independently and without notifying Scottsdale. Doc. 30 at 2. When Rimkus notified Scottsdale of the deposition order, Scottsdale filed in this Court an Emergency Motion to Enforce Abatement by a Temporary Restraining Order. Doc. 30. Russell responded the state court action was necessary to investigate "alleged fraud" in the Rimkus report, i.e. the engineer's alleged statement to Scottsdale's appraiser that he had paid little attention to the north wall, which Russell argued might constitute a "million dollar lie." Doc. 33 at 3. Leaving aside the apparent frivolousness of such a claim, this Court lifted the abatement for the limited purpose of allowing Russell to depose the Rimkus engineer. Doc. 35. In the deposition, Russell asked the engineer whether he still stood by the statement, "The west, south, east and north masonry walls were plumb and not misaligned":

      Q. That's an accurate statement, correct?

A. Yes . . . .

Q. And they appeared vertical to the naked eye?

A. Yes.

Q. If the wall was visually leaning towards the street, that's something that you would have put in the report?

A. Yes.

Q. If there was some sort of deformity in the wall that needed to be remedied, that would have been something that would have been in your report as well?

A. Yes. . . .

Q. [C]ertainly if they were misaligned to the extent that someone needed to do a million-dollar repair to the north wall, that's something that would have been reflected in this report?

A. Yes. I looked at all the walls and they were plumb.

Q. Right. And you didn't concentrate on one particular wall; you were interested to make sure all the walls were plumb, correct?

A. Yes.

Doc. 42-2 at 6 to 14. Russell's own report by Clark Engineers concludes, based on the Rimkus report: "From this data and observations, it is apparent that there was not any significant distortion of the north wall prior to Hurricane Ike." Doc. 31-2 at 27 (citing Clark report at 15 ¶ 2). The Clark report goes on, however, to state that the Rimkus report failed to provide "any measurements, calculations, or data to substantiate their observations and conclusions." *Id.* (citing Clark report at 10 ¶ 17). The Clark report also concedes, "cracks may have been present prior to Hurricane Ike," and the report describes deformation of the wall around the lintels as UBS, "in agreement with the Rimkus report." *Id.* (citing page 10 of Clark report).

After examining the engineers' reports, the umpire and Scottsdale's appraiser agreed to the North Wall Award of $153,283.13, equal to the Actual Cash Value[4] of damage to the north wall. Doc. 52-4 at 8. The Award was signed January 19, 2013 by the umpire and January 20, 2013 by Scottsdale's appraiser. *Id.* at 9. The agreement describes the North Wall Award as "the

---

[4] The appraiser and umpire agreed to $204,377.51 Replacement Cost Value, less depreciation of $51,094.38. The Policy provides for Actual Cost Value, including depreciation, until the damaged property is actually repaired or replaced. *See* note 1, *supra*. In its letter tendering payment, Scottsdale explained: "In the event that the Russells repair the north wall, please have them forward proof of their costs (invoices, cancelled checks, etc.) to Scottsdale so that it may pay any amount due with regard to such repairs under the terms the above referenced policy up to a total additional amount of $51,094.38, which is the depreciation reflected on the enclosed award." Doc. 52-4 at 47.

final portion of the award of wind damage sustained by the building as a result of Hurricane Ike"; however, the Award "does not address the issue of the temporary roof, which was put in place by Mr. Russell after the hurricane and whether any payments, which were previously made by the insurer were to cover the cost of the temporary roof." Doc. 52-4 at 8. Scottsdale tendered a payment for the north wall, agreed by Scottsdale's appraiser and umpire. Russell refused payment and demanded $500,000 for the north wall plus costs and fees of litigation. Doc. 52-4 at 56. In the Fifth Joint Status Report, on March 25, 2013, Russell again agreed $153,283.13 was the correct amount of actual damages outstanding but asserted "extra contractual claims for bad faith delay and the like." Doc. 52-5 at 7.

On October 2, 2013, the parties filed a Joint Motion to Lift Abatement so the Court could resolve the dispute. Doc. 49. By the parties' requests, the deadline for the response and reply was extended to February 20, 2014, and April 4, 2014, respectively.

## II.   Legal Standard

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over such a fact is genuine if the evidence presents an issue "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Initially the moving party bears the burden of identifying evidence that no genuine issue of material fact exists, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the nonmovant bears the burden of proof at trial, the movant need only point to the absence of evidence supporting an essential element of the nonmovant's case; it does not have to support its motion with evidence negating the case. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). The nonmovant then can defeat the motion for summary judgment

only by identifying specific evidence of a genuine issue of material fact, *Anderson*, 477 U.S. at 248-49.

## III.   Discussion

### A.   *Breach of Contract*

Appraisal awards in Texas are binding and enforceable, and courts indulge every reasonable presumption to sustain them. *In re Allstate County Mut. Ins. Co.*, 85 S.W.3d 193, 195 (Tex. 2002). An insured is estopped from asserting breach of contract when the insurer "makes timely payment of a binding and enforceable appraisal award, and the insured accepts the payment." *Blum's Furniture, Co., Inc. v. Certain Underwriters at Lloyds London*, 459 F.App'x 366 (5th Cir. 2012). Russell argues his claim of breach of the Policy is not estopped under *Blum's*, because he did not "accept[] the payment." *Id.* After *Blum's*, however, the Fifth Circuit has held there was no breach of contract when an insurer "tendered the amount articulated in the [appraisal] award," even when payment was refused by the insured. *TMM Invs., Ltd. v. Ohio Cas. Ins. Co.*, 730 F.3d 466 (5th Cir. 2013). The act of tendering payment suspends the obligation. *Probus Props. v. Kirby*, 200 S.W.3d 258, 262 (Tex.App.—Dallas 2006, pet. ref'd) (cited in *TMM Invs.*, 730 F.3d at 475). Moreover, the suggestion in *Blum's* that acceptance is an element of a binding appraisal award does not necessarily follow from the Texas case cited. *Franco v. Slovanic Mut. Fire Ins. Ass'n*, 154 S.W.3d 777, 787 (Tex.App.—Houston [14th Dist.] 2004, no pet.) (stating without explanation: "[The insurer] paid the full amount of the award to [the insured], and [the insured] accepted payment of the award. The award is binding and enforceable."); *see Devonshire Real Estate & Asset Mgmt., LP v. Am. Ins. Co.*, 3:12-CV-2199-B, 2014 WL 4796967 (N.D. Tex. Sept. 26, 2014) (reference to acceptance in *Blum's* is "based on an over-reading" of *Franco*; "so long as there is a binding and enforceable appraisal award and the

insurer timely and full pays the resulting award, estoppel should apply regardless of whether the insured actually accepts payment.").

### B.    Extracontractual Claims

Russell asserts claims of common-law and statutory bad faith,[5] negligence, and negligent misrepresentation. Doc. 1-2. In the absence of breach of contract, an insured may only prevail on extracontractual claims such as bad faith in two circumstances: (1) the insured "commit[s] some act, so extreme, that would cause injury independent of the policy claim," or (2) fails "to timely investigate the insured's claim." *Blum's*, 459 F.App'x at 368. quoting *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995). Russell does not offer any evidence of injuries caused by Scottsdale independent of the policy claim, nor a failure to timely investigate the claim. Here, Scottsdale began its investigation less than 30 business days after notice, in accordance with the Texas Insurance Code. Doc. 51 at 8. In his Response, Russell concedes that his extracontractual claims are barred if there is no breach of the Policy. Doc. 56 at 17 ("Scottsdale argues that the Russells remaining claims cannot survive unless the breach of contract action is valid. This is a correct statement of the law.").

Nonetheless, even if Russell had shown a breach of the Policy, he has failed to provide evidence supporting any of his extracontractual claims. To show bad faith, an insured must show the insurer "had no reasonable basis for denying or delaying payment of the claim, and that it knew or should have known that fact." *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 18 (Tex. 1994). Where an insurer relies upon expert reports to deny a claim, the insurer's reliance "will not necessarily shield the carrier if there is evidence that the report was not objectively prepared

---

[5] Russell asserts bad faith, breach of the duty of good faith and fair dealing, and violations of the Texas Insurance Code § 541.060 ("failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of . . . a claim with respect to which the insurer's liability has become reasonably clear"), §542.003 (same), § 542.058 ("delay[ing] payment for a period exceeding the period specified by other applicable statutes or, of other statutes do not specify a period, for more than 60 days"). Doc. 1-2.

or the insurer's reliance on the report was unreasonable." *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 448 (Tex. 1997); *Lyons v. Millers Cas. Ins. Co. of Texas*, 866 S.W.2d 597, 601 (Tex. 1993) (holding that insured must offer evidence that the insurer acted without a reasonable basis and knew that fact, such as "evidence that the reports . . . were not objectively prepared, or that [the insurer's] reliance on them was unreasonable."); *Moriel*, 879 S.W.2d at 18 ("A simple disagreement among experts about whether the cause of the loss is one covered by the policy will not support a judgment for bad faith.").

Here, Scottsdale relied upon the U.S. Forensic report in denying the claim. Russell has shown no evidence calling into question the reasonableness of Scottsdale's reliance on the report. In fact, Russell's own engineer called into question the generous estimate of the damage to the north wall in the U.S. Forensic report. Doc. 31-2 at 27 (citing Clark report at 10 ¶ 17) (noting that U.S. Forensic report failed to provide "any measurements, calculations, or data to substantiate their observations and conclusions."). The Clark report explained the vast difference between the actual size of the bulge, which UBS measured with a laser at 0.7 to 1.3 inches, and U.S. Forensic's visual estimate of "approximately 4 inches" or "up to approximately 3.5 inches") by suggesting the wall was"self-correcting," an explanation UBS found "illogical, as a masonry wall with 3.5 to 4" of deflection will not repair itself.") Doc. 31-2 at 27 (citing Clark report at 15 ¶ 2). Russell's engineer also conceded "cracks may have been present prior to Hurricane Ike," which is consistent with the pre-Ike photographs showing obvious cracking and deformity of the north wall. Doc. 31-2 at 23 (citing Clark report at 6). Russell's only evidence calling into question the U.S. Forensic report relied upon by Scottsdale remains his own testimony and the observation in the Rimkus report that the wall was "reasonably plumb" three years before Hurricane Ike. The Rimkus engineer's deposition by Russell's attorney (made under threat of a

lawsuit in state court brought by Russell for conspiracy to commit insurance fraud), present minimal evidence of a "simple disagreement among experts" and no evidence of unreasonable acts by Scottsdale. *Moriel*, 879 S.W.2d at 18. On the contrary, the evidence suggests it would have been unreasonable for Scottsdale to conclude the damage to the north wall was caused by Hurricane Ike. As for Russell's own testimony, his own statement that there was no bulge in the wall before Hurricane Ike is inconsistent with his threatened lawsuit against Rimkus. If he knew the wall was plumb, why would he threaten to sue Rimkus for fraudulently stating that fact?

Russell maintains Scottsdale acted in bad faith by "forcing" him to file suit to enforce the appraisal process. Docs. 52 at 10, 56 at 5. The only evidence Russell provides for this claim is the fact that Scottsdale did not spontaneously invoke the appraisal process. The Policy does not put the burden on Scottsdale to invoke the process: "If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser." Doc. 52-2 at 32. After Russell filed suit, Scottsdale agreed to Russell's Motion to Abate and Enforce Appraisal Provision. Doc. 18; Doc. 31-1 at 55.

Russell argues Scottsdale further showed bad faith during the appraisal process by "attempt[ing] to thwart all attempts of Plaintiff to discover the truth" from the Rimkus engineers (Doc. 52 at 8 n. 2) and misrepresenting the engineers' opinion about their previous report. In fact, Scottsdale's appraiser encouraged Russell's appraiser on multiple occasions to contact the Rimkus engineers, providing their phone and email information. Doc. 31-1 at 52 ("I suggest that you contact the Rimkus engineer to discuss with him his evaluation of that building. I am sure you will find that conversation interesting. . . . I would recommend that you complete your own investigation of the facts by talking with him."). On the other hand, it is not clear that Russell

himself pursued the appraisal process in good faith. In addition to filing suit against Scottsdale, rather than invoking the appraisal provision, he twice moved to lift the abatement to reopen litigation. Meanwhile, he attempted to depose Rimkus through a state court action while the appraisal process was ongoing.

Russell argues Scottsdale showed bad faith during the appraisal process by improperly attempting to deduct temporary repairs from the award. Doc. 42 at 4. In fact, the appraisers did not agree on whether the temporary repairs were included in the award or should be charged separately; there was never any discussion of *deducting* the cost of the repairs. Doc. 52-4 at 5. In the end, Scottsdale agreed to pay the cost of the repairs in addition to the appraisal award. Doc. 52-4 at 17. Scottsdale had already advanced $45,000 to cover the temporary repairs after deducting $15,242.50 in apparently inflated claims by Russell.[6] Doc. 52-4 at 17–18, 34. Russell further argues Scottsdale showed bad faith by improperly attempting to deduct depreciation from the award. Doc. 42 at 4. Deductions for depreciation are set forth in the Policy. The Policy provides for Replacement Cost Value, i.e. cost of replacement or repairs, but only after the damaged property is replaced or repaired. Until that time, the Policy provides for Actual Cost Value, i.e. the depreciated value of the property at the time of damage. Docs. 52-2 at 22; 52-3 at 36–37; 52-4 at 47. Finally, Russell argues Scottsdale showed bad faith by its continued denial of coverage for the claim. In particular, Russell cites Scottsdale's reservation of its rights, both in the Policy and in the letter agreement to abate (signed by both parties), to deny claims after appraisal ("[I]f there is an appraisal, we will still retain our right to deny the claim."). Doc. 56 at 7; Doc. 31-1 at 57. But Scottsdale did not deny the claim; it tendered payment for both appraisal awards.

---

[6] Russell initially submitted a statement of $58,975.00 for temporary repairs, which included unspecified credit card charges of $21,000 and $22,732.50 disputed by Scottsdale. In response, Russell submitted an invoice for temporary repairs of $43,732.50. Doc. 52-3 at 7.

Russell concludes: "To limit the Russells to only the appraisal award after having to spend tens of thousands suing and fighting to get anything at all for the claim would render the only remedy the Russells had—suing to enforce the contract—economically worthless." Doc. 52 at 12. Russell had a remedy, provided expressly in the Policy, to invoke appraisal. Any expenses Russell incurred in obtaining an award outside of the appraisal provision were its own doing.

## IV.     Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that Defendant Scottsdale Insurance Company's Motion for Summary Judgment (Doc. 51) is **GRANTED** against all claims and George Russell, *et al.*'s case is **DISMISSED**.

SIGNED at Houston, Texas, this 30th day of September, 2014.

_Melinda Harmon_
MELINDA HARMON
UNITED STATES DISTRICT JUDGE